UNITED STATES of America,

v.

Teddy MOUSTAKIS, Defendant.

No. S4 92 Cr. 869 (MGC).

United States District Court,
S.D. New York.

Oct. 12, 1994.

Mary Jo White, U.S. Atty., S.D.N.Y. by Guy Petrillo, Lorin L. Reisner, Asst. U.S. Attys., New York City, for U.S.

Dana Hanna, New York City, for defendant.

## OPINION

CEDARBAUM, District Judge.

On March 3, 1994, after a trial by jury, Teddy Moustakis was found not guilty of engaging in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c) (Count Two), and not guilty of conspiring to engage in such an enterprise, in violation of 18 U.S.C. § 1962(d) (Count One). He was found guilty under 18 U.S.C. § 371 of conspiring to violate 18 U.S.C. § 2314 by transporting stolen goods interstate (Count Twelve). At the close of the Government's evidence, Moustakis moved pursuant to Fed.R.Crim.P. 29(a) for a judgment of acquittal on all three counts and I reserved decision. Moustakis renewed the motion at the end of the entire case, and now renews the motion as to Count Twelve. He also renews an evidentiary objection and a later motion to strike the objectionable evidence. For the reasons discussed below, Moustakis' motion for a judgment of acquit-

tal on Count Twelve is granted, as is his motion to strike.

### Discussion

Count Twelve charged that in or around May of 1990, defendants Moustakis, Robin Tellier, and Roy Tellier, along with Alphonse Rescigno, Ronald Rescigno, and Timothy Burns, conspired to transport interstate original works of art stolen from Nahan Gallery. Moustakis argues that there was insufficient evidence from which a reasonable juror could have found, beyond a reasonable doubt, that he was guilty of this charge.

### I. Standard

The Second Circuit, in *United States v. Taylor*, 464 F.2d 240 (2d Cir.1972), adopted the following standard for evaluating challenges to the sufficiency of the evidence:

> "'... [A] trial judge ... must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.'"

*Id.* at 243 (quoting *Curley v. United States*, 160 F.2d 229, 232–33 (D.C.Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1512, 91 L.Ed. 1850 (1947)); *see United States v. Strauss*, 999 F.2d 692, 696 (2d Cir.1993). The burden placed on a defendant to meet this standard is "'very heavy.'" *Strauss*, 999 F.2d at 696 (quoting *United States v. Chang An–Lo*, 851 F.2d 547, 553 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988)). In reviewing the defendant's challenge, the court must "view the evidence, both direct and circumstantial, in the light most favorable to the government and must credit every inference that could have been drawn in

its favor." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 211, —— L.Ed.2d —— (1994).

## II. *The Evidence*

The Government relies on the following evidence to prove the existence of the conspiracy charged in Count Twelve, and to establish Moustakis' role in that conspiracy. In late March and April of 1990, Robin Tellier began discussing plans to commit a robbery with Charles Schrader. (Tr. at 1121–23; 1151–60; 1163–64.) Schrader, who was cooperating with the Government, recorded these discussions. (Gov't Exs. 705, 710, 711, 713.) On May 1, 1990, Robin Tellier met with Schrader at Schrader's apartment and asked him if he was ready to participate in the robbery. (Tr. at 1215–17.) Robin Tellier then told Schrader that he planned to rob an art gallery, and that he knew someone who was willing to buy the stolen art. (Tr. at 1220–24.)

This May 1, 1990 conversation between Robin Tellier and Schrader was also recorded by Schrader. (Tr. at 1215; Gov't Ex. 715.) The transcript of this tape, prepared by the Government, reads, in part:

> Schrader: Robin I need, I need money man. I need money, bad.
>
> Tellier: (Unintelligible, "UI")
>
> Schrader: You don't you don't understand. Today's the first and I don't get paid till Thursday, I only get $328 and my rent is $459.
>
> Tellier: Uh, let me tell you what's there, O.K. What's there how (UI). . . .
>
> Schrader: Teddy?
>
> Tellier: Five months I have to write (UI) . . .
>
> Schrader: Teddy?
>
> Tellier: Yeah. (UI) . . . store . . . twice. Okay?
>
> Schrader: There [are] no gooks in my building.
>
> Tellier: All I'm saying is let's pay (UI), now I owe over 5 months on my medical (UI). . . .

(Gov't Ex. 715T at 4–5.) Schrader testified that in the unintelligible portion of Robin Tellier's second entry, Robin Tellier told him that he had sent Moustakis to Nahan "to scope the place out." (Tr. at 1217).

Moustakis introduced into evidence a copy of this tape that had been enhanced by an expert in audio forensics, and contends that the transcript should read:

> Tellier: Uh, let me tell you what's there, O.K. I haven't paid Ted rent in five months.
>
> Schrader: Teddy?
>
> Tellier: Five months. I have the rent . . .
>
> Schrader: Teddy?
>
> Tellier: Yeah. Ted called there at the store today, twice. Okay?

(Def. Ex. T.) According to the Government's transcript of this same conversation, Robin Tellier later told Schrader that he was renting an apartment from Moustakis. (Ex. 715T at 7–8.)

Schrader testified that sometime after midnight, on May 3, 1990, Robin Tellier and Burns picked him up at his apartment. (Tr. at 1262–63; 1269.) Schrader was wearing a body wire and recorded the group's conversations throughout part of the night. (Tr. at 1263; Gov't Ex. 716.) Robin Tellier, Burns, and Schrader drove to Robin Tellier's apartment and then drove to Moustakis' house. (Tr. at 1269–78.) According to Schrader, they spent between thirty and forty-five minutes at Moustakis' house. (Tr. at 1278.) The tape recording reveals no discussion at Moustakis' house of the planned robbery. Schrader testified that after leaving Moustakis' house, he, Robin Tellier, and Burns met Alphonse Rescigno and Ronald Rescigno at a club in Queens, drove into Manhattan, and broke into Nahan Gallery, stealing art work valued at more than $200,000. (Tr. at 1279–1316.)

Robin Tellier was arrested for his participation in the Nahan robbery on May 3, 1990. On May 5, 1990, he called Schrader, whom he suspected was cooperating with the police, and told him that two people would be coming to see him. (Tr. at 1333–34; 1338–41; Gov't Ex. 718.) Robin Tellier's brother Ronald then called Schrader and arranged to meet him in a park. (Tr. at 1344–47.) At the park, Schrader met Ronald Tellier and Moustakis. (Tr. at 1349–51.) Schrader tes-

tified that Moustakis threatened him with physical harm and told him to leave town so that he would not be able to testify before the Grand Jury in connection with the Nahan robbery. (Tr. 1355–56.)

Bruce Rubino, another cooperating witness, testified that Moustakis came to him for help in meeting the bail requirements for Robin Tellier. (Tr. at 4490.) Rubino testified that at this time, he asked Moustakis if the art from Nahan was still available. He testified that "[Moustakis] said that it was, but he couldn't discuss it without Robin's permission." (Tr. at 4491.) Rubino further testified that he later told Robin Tellier that he may have people who were interested in purchasing the art, but that "Robin said that it's very hot and he has to lay low on that right now...." (Tr. at 4492.)

Neither Schrader nor Rubino offered any information regarding the alleged plan to transport the stolen art out of the state. The only evidence offered regarding this plan was the plea allocution of Burns. Burns pleaded guilty on September 14, 1993 to one count of conspiring to transport interstate property stolen from Dyansen Gallery and Nahan Gallery. During the trial, on February 9, 1994, Burns was ordered to appear in court and, out of the presence of the jury, stated under oath that if called to testify at trial, "I'd invoke my Fifth Amendment [privilege against self-incrimination]." (Tr. at 6918.)

The following portions of Burns' plea allocution were admitted into evidence:

**The Court:** Mr. Burns, I would like you to tell me in your own words what you did. **The defendant:** In February, an art gallery in the city [Dyansen] had paintings taken from it and they were going to be sold outside of New York. The same thing happened in May. Q: Let's just stop for a moment. What did you have to do with that? A: I was the lookout. Q: You were the lookout for the stealing of those goods, is that correct? A: Yes, I was, your Honor. Q: Did you have any doubt that those goods were being stolen? A: No, I didn't. Q: And that you were helping to effect that theft? A: Yes, I was. Q: How did that come about? Did you have an agreement with other people in advance of that to do it? You didn't just happen to stand there, is that right? A: Yes, your honor. Q: What happened? How did you get involved? A: It was brought to the attention of me that an art gallery could be burglarized in the middle of the night. Q: Somebody told you that? A: Someone asked if I wanted to go. Q: Was this somebody you knew? A: Yes, it was a person I knew. Q: And did that person tell you what you would get out of it if you helped with it? A: I was told that all I had to do was make sure that nobody, no police came. And after we were done we would sell the stuff out of New York, so that nobody could find it and that I would receive a payment for it. A number was never spoken, like amount of how much I would receive. Q: Where were you when you had this discussion? A: Street corner, hanging out.... Q: So, at midnight, in February of 1990, you went to the corner of Steinway Street and you waited for the car that this person was driving ... to arrive? A: Yes. Q: And when he came, what happened? A: Went directly into the city. Q: You got in the car? A: Yes. Q: Did you have a gun? Did he give you a gun? A: No, your Honor. Q: Where did you go? A: Went directly into the city and waited a couple of hours. And then, when it was late enough, went straight to the place, broke the window. The stuff was taken, thrown in the back of the car, and we left.... Q: Where did you stand when you got out of the automobile? A: Directly on the corner. The store is directly on the corner.... Q: What was taken from that store? You stood on the corner. Did several other people go into the store? A: No. Q: How many went? A: Just one.... Q: The same person who had talked to you? A: Yes. Q: Went into the store, broke the window, is that right? A: It's just a door window, like a door with the window on top of it. Q: Broke that window so you could get to the lock? A: No. You can step right over the door there. Q: It's a full length glass. And what is it that [he] took out of that store? A: Paintings. Q: How many paintings? A: I don't. Q: Did he come in and out several times? A: Yes, about four

times. Q: And who was guarding the car with the paintings? A: I was sitting on the corner with the trunk open. Q: And just the two of you were there? A: There was another person there, who was sitting in another car down the block watching. Q: In the other direction? A: Yes. Q: At some point, did this man come back to the car, the man who was going in and out, taking paintings? A: Yes, he went back to the car. Q: He came back and you saw him come back? A: Yes. Q: Did he say to you, 'Come, let's go?'? A: Yes. Q: And then what happened? A: Jumped in the car, drove over the bridge. I was dropped off, not near my house, and I took a cab home. And that was the last I seen of them until a couple of days later. Q: And what happened a couple of days later? A: The stuff that was taken was supposed to be—what I was told was it was found and he said he didn't know how it was found. So I thought maybe he is lying. And then someone told me they seen it in a newspaper. And then I seen the other gentleman who came on the thing. He felt that he was also ripped off, but it wasn't— it was true, the place where they left the stuff had been found. Q: And when you say the place where they left the stuff, was it a storehouse? A: It was a garage. Q: What was the plan? What were they holding it in that garage for? A: So that someone could come look at it so that they would take it and it would be brought to wherever outside of New York to be sold. Q: The plan was to send it out of New York? A: Yes. Q: It was too hot in New York? A: Yes, your Honor. Q: What did you get from that? A: Absolutely nothing. Q: What did you expect to get? A: No figure was ever spoken. Q: Why were you willing to assist? A: He said it was art- work and you not buy it for $10, but somebody else may buy it for $10,000. It's whatever you can get for it. Q: I under- stand. But what made you decide you wanted to share in an illegal activity? A: I thought I could get some quick money. Q: You didn't have any doubt, I take it, that what you were doing was a violation of the criminal law? A: No, I have no doubt. Q: Was there something else you did in furtherance of this arrangement with this man? A: Yes, your Honor. Q: What was that? A: That was the Nahan Gallery. . . . Q: And did this man again tell you that he needed you to be a lookout? A: Yes, he did. Q: How long after the first was that? A: Month and a half. Q: And what hap- pened that second time? Did you agree again to help? A: Yes, I did. Q: And again, was the plan to steal these goods and send them out of state to another state? A: Same plan. Q: What did you do? A: Same thing. I was picked up on the corner, same location, in front of a pizzeria. Drove around, told to wait for a couple of hours. They came back with another car to go into the city with. They came back with the car. We all got into one car, went into the city, drove around, made sure there were no police in the area. There was another car behind us with just one person in it. Q: How many people were in the car? A: There were four. Q: This time you were a larger group? A: Yes. Q: Did you know all four people? A: Yes. Q: These were people that you knew before? A: Yes, I knew them from the neighborhood. Q: You drove into Manhattan again? A: Yes. Q: Where did you go? A: To the Nahan Gallery. Q: Where is that? A: It's—East Broadway, West Broadway. Q: Then what hap- pened? A: Pulled the car up in front. Three guys broke the window, went inside. I stood in the middle of the street. Again, as soon as the window was broken, two guys went in. The other guy stood in front of the store. Q: So you got in through the window? A: The stuff was removed from the place, put into the car, as soon as the car was full, got back in the car and left."

(Tr. at 6951–60.)

## III. *Elements of a Conspiracy to Violate § 2314*

Count Twelve charged Moustakis with con- spiring to violate 18 U.S.C. § 2314. That statute provides as follows:

Whoever transports, transmits or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or

money, of the value of $5,000 or more, knowing the same to have been stolen ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Moustakis does not dispute that the Government provided sufficient evidence that the art was stolen from Nahan Gallery and that it was valued at more than $5,000. Instead, Moustakis argues that the Government failed to prove that he knew of the plan to transport the art interstate. The Government acknowledges that it offered no proof of Moustakis' knowledge of this plan, but argues that such proof is unnecessary to sustain the conviction.

■ The Second Circuit, in *United States v. Eisenberg*, 596 F.2d 522 (2d Cir.), *cert. denied*, 444 U.S. 843, 100 S.Ct. 85, 62 L.Ed.2d 56 (1979), addressed an argument similar to that of Moustakis and held that a defendant's knowledge of the interstate transportation is not an element of the offense. "The element of interstate transportation is merely a jurisdictional element, for which proof of the fact of transportation is proof enough." *Id.* at 526. *Cf. Rosa*, 17 F.3d at 1544 (knowledge of interstate transport not an element of 18 U.S.C. § 2315, but "merely the premise for federal jurisdiction").

However, although the Government need not prove that Moustakis knew of the plan to transport the art interstate, it must establish that this was in fact the plan in order to prove that a conspiracy to violate § 2314 existed. The Government may satisfy this element of the conspiracy charged in Count Twelve by proving either that the stolen goods were in fact transported interstate, as in *Eisenberg*, or by proving that there was a plan to transport the stolen goods interstate. *Cf. Rosa*, 17 F.3d at 1546. The Government acknowledges that it offered no proof that the stolen art was ever transported out of the state. It contends that the plea allocution of Burns, which provided evidence of the conspirators' plan to transport the art out of the state, was sufficient to satisfy this element. Moustakis argues that Burns' plea should be stricken because the absence of any corroborating evidence regarding the conspirators'

plan to transport the art out of the state calls into question the reliability of Burns' allocution. Moustakis also argues that certain statements made by the Government in its rebuttal summation regarding Burns' allocution further undermined its reliability.

## IV. *Burns' Plea Allocution*

■ Burns was charged in S1 92 Cr. 869 (MGC) with engaging in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c) (Count Two), and conspiring to engage in such an enterprise, in violation of 18 U.S.C. § 1962(d) (Count One). He was also charged with conspiring to commit robbery at both Dyansen Gallery and Nahan Gallery, in violation of the Hobbs Act, 18 U.S.C. § 1951 (Counts Eleven and Fourteen), and carrying a handgun during these robberies, in violation of 18 U.S.C. § 924(c)(1) (Counts Twelve and Fifteen). As stated above, Burns pleaded guilty to a one-count information which charged him with conspiring to transport in interstate commerce property stolen from Dyansen Gallery and Nahan Gallery. As part of the plea bargain, the Government agreed to move to dismiss the charges in the original indictment.

> Fed.R.Evid. 804(b)(3) provides in part:
> The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness: ... [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The Second Circuit, in *United States v. Winley*, 638 F.2d 560 (2d Cir.1981), *cert. denied*, 455 U.S. 959, 102 S.Ct. 1472, 71 L.Ed.2d 678 (1982), upheld under Rule 804(b)(3) the admissibility of coconspirators' plea allocutions, which had been offered as evidence that a

conspiracy to commit bank robbery existed. These plea allocutions corroborated an accomplice witness' testimony regarding the robbery. The court stated:

> It is hard to conceive of any admission more incriminating to the maker or surrounded by more safeguards of trustworthiness than a plea of guilty in a federal court, *particularly when, as here, the facts elicited in the allocution are buttressed by the testimony of other witnesses....* In any event, whether corroborating circumstances establish the trustworthiness of a guilty plea is a determination to be made by the district judge in the exercise of his sound discretion.

638 F.2d at 562 (emphasis added). In *United States v. Williams,* 927 F.2d 95 (2d Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 307, 116 L.Ed.2d 250 (1991), the Second Circuit examined under Rule 804 the admissibility of four plea allocutions that were introduced to establish the existence of a narcotics conspiracy. The court found that the allocutions were "cumulative in nature" and, relying on *Winley,* upheld their admissibility. *Id.* at 99.

Moustakis argues that the absence of any evidence to corroborate Burns' statement regarding the conspirators' alleged plan to transport the art out of the state makes it impossible for the court to determine whether Burns' statement is reliable and thus capable of supplying the only evidence of an element required for Moustakis' conviction. This concern was raised by me prior to submitting this count to the jury. (Tr. at 8604–12.) At that time, the Government agreed that Burns' plea allocution was necessary to support a conviction on Count Twelve and in effect that a judgment of acquittal on this count would be required if the Court should ultimately decide that Burns' allocution should be stricken. (Tr. at 8614.) When the Government originally offered Burns' plea allocution into evidence, it did not disclose that this allocution provided the only evidence of the plan charged in Count Twelve to transport the stolen art out of the state.

The Second Circuit, in *Winley,* stated that the "trustworthiness" of a guilty plea is to be determined by the trial judge in light of all the corroborating evidence. 638 F.2d at 562.

Although Burns' statement regarding his participation in the robbery of Nahan Gallery was corroborated by Schrader's testimony and the tape recordings made by Schrader, no such corroboration was offered to support Burns' statements regarding the plan to transport the art out of the state.

■ While in certain circumstances a guilty plea alone may be sufficiently reliable without corroboration, this is not such a case. When Burns pleaded guilty to one count of transporting stolen goods interstate, he did so as part of a bargain to avoid facing very serious charges, including RICO and RICO conspiracy, as well as Hobbs Act charges in connection with his participation in the Nahan Gallery and Dyansen Gallery robberies. The testimony at trial revealed that the Government had substantial evidence of Burns' participation in those robberies, which might have been sufficient to convict Burns on the RICO charges as well. Moreover, although Burns' statement that the group planned to sell the art stolen from Nahan Gallery out of the state was a necessary element of the crime to which he pleaded guilty and thus subjected him to criminal liability, the main focus of his allocution was his participation in the robberies. His statement regarding a plan to transport the art stolen from Nahan Gallery out of the state was essentially a technical admission with no discussion of the details, and is not likely to have carried the same importance in Burns' mind as did his statements regarding the actual robberies. For these reasons, Burns' uncorroborated statement in his plea allocution regarding the plan to sell the art out of the state cannot fairly be said to have been "so far contrary" to his interest as to provide sufficient assurance of its trustworthiness.

■ The Second Circuit, in *United States v. Scopo,* 861 F.2d 339 (2d Cir.1988), *cert. denied,* 490 U.S. 1048, 109 S.Ct. 1957, 104 L.Ed.2d 426 (1989), stated that:

> *In general* a plea of guilty is a statement against the penal interest of the pleader for the obvious reason that it exposes him to criminal liability.... Likewise, so much of the allocution as states that that defendant committed or participated in the

commission of a crime, thereby permitting the court to accept the plea, ... *is normally* against his interest. If, however, a pleading defendant had an agreement with the government or with the court that he would not be punished for the crimes to which he allocuted, then that allocution would not subject him to criminal liability and would not constitute a statement against his penal interest within the meaning of Rule 804(b)(3).

*Id.* at 348 (emphasis added). The emphasized language suggests that the trial court must consider the circumstances surrounding a plea to determine whether it is in fact totally trustworthy, and therefore admissible without corroboration. The technical portion of Burns' plea allocution on which the Government relies—a conclusory admission to a plan to transport the art stolen from Nahan Gallery out of the state—does not carry the same indicia of reliability as are usually required to support an exception to the hearsay rule. Moreover, although the Government presented the testimony of a cooperating witness who participated in the robbery of Nahan Gallery, the Government offered no testimony or other evidence to corroborate that portion of Burns' plea allocution that referred to a plan to transport the stolen art out of the state. In the absence of any corroborating evidence, the motion to strike that portion of Burns' plea allocution is granted. Therefore, I do not reach Moustakis' other arguments.

Finally, the trustworthiness of another part of Burns' plea allocution was questioned by the Government in its rebuttal summation. The Government argued to the jury:

> Mr. Fallick told you to ask for Timmy Burns' guilty plea allocution to be read back if you wanted to find out what happened at Dyansen and Nahan. Robin Tellier's sidekick, remember the guy whose share he used to take for himself and make him take him out to dinner. Ask for it to be read back.
>
> I assume the reason Mr. Fallick wants you to have it read back is because Timmy Burns lied during that allocution. He said he didn't know there was a gun at Dyansen and Nahan. Please. Please. This is the Timmy Burns who is on tape talking about the Mac 10 that they had on the last job and how it had been seized by the police at the garage. ...

(Tr. at 8433.) Burns' plea allocution was originally offered into evidence by the Government under Rule 804(b)(3) as an exception to the hearsay rule on the basis of its inherent reliability. The Government's later assertion to the jury that a part of Burns' plea allocution was false emphasizes the doubtful reliability of the uncorroborated hearsay on which the sufficiency of Moustakis' conviction depends.

### Conclusion

Without the uncorroborated plea allocution of Burns, there is no evidence from which a reasonable juror could have concluded that Moustakis conspired to transport the art stolen from Nahan Gallery out of the state. Moustakis' motions to strike Burns' plea allocution and for a judgment of acquittal are therefore granted.

SO ORDERED.