UNITED STATES of America

v.

Isaac **REINHOLD**, Josef Goldstein, a/k/a "Yossie Goldstein," a/k/a "Joseph Goldstein," Irving Goldstein, Michael Mendlovic, Herbert Greenfield, United Talmudical Academy of Boro Park, Defendants.

No. (S2) 97 CR. 686 (AGS).

United States District Court,
S.D. New York.

Sept. 2, 1998.

542

Jeremy Temkin, Teresa Pesce, Assist. U.S. Attorneys, U.S. Dept. of Justice, New York City, for U.S.

Gerald Shargel, New York City, for Irving Goldstein.

Jay Goldberg, P.C., New York City, for United Talmudic Academy.

Frederick D. Hafetz, Goldman & Hafetz, New York City, for Michael Mendlovic.

Elkan Abramowitz, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for Josef Goldstein.

Albert James Brackley, Brooklyn, NY, for Isaac Reinhold.

Andrew J. Levander, Shereff, Friedman, Hoffman & Goodman, LLP, New York City, for Herbert Greenfield.

### *OPINION AND ORDER*

SCHWARTZ, District Judge.

Before the Court are the motions of defendants Isaac Reinhold, Josef Goldstein, Michael Mendlovic and Herbert Greenfield for new trials and/or judgments of acquittal pursuant to Federal Rules of Criminal Procedure ("Fed. R.Crim.P.") 29 and 33. For the reasons stated, these motions are denied.

### FACTUAL BACKGROUND

Viewing the evidence at trial in the light most favorable to the Government, as is required for purposes of these motions, the Government has established the following facts.

Defendant Irving Goldstein, together with his wife, owned and operated 47th Street Photo, Inc. ("47th Street"), a highly successful company that sold photographic equipment, consumer electronics, and computers. Goldstein was also the owner of Micro Innovation Computer Center ("Micro"), which was in the same business as 47th Street, and Maxum Systems, Inc. ("Maxum"), which manufactured "house brand" computers for sale by Micro. Though actually controlled by Goldstein, Micro and Maxum were both nominally run by others. When these businesses began to collapse, Goldstein, with the aid of certain of his relatives and employees, resorted to criminal means to try to salvage these companies.

## I. The Negotiation of the Fidelity Contract

The relevant background traces to events in the early 1990s. In January 1992, 47th Street declared bankruptcy. In late 1993, a representative of Bank Hapoalim, Micro's major source of credit, told Micro's President, defendant Isaac Reinhold, that the bank preferred to cease funding certain businesses in New York and suggested that Micro begin to seek alternative sources of financing. (Tr. 1502–05, 2256.) Micro's other major source of financing at the time, a revolving "floor plan" line of credit from AT & T Capital Corp. ("AT & T"), was also at its limit. (Tr. 682–684, 2255–57.) In the fall of 1994, Micro, strapped for funds, needed money to complete a $1.3 million contract to supply computers to the New York State Department of Taxation and Finance (the "New York State Contract"). (Tr. 2268–69.) To secure such funding, Irving Goldstein turned to his brother-in-law, defendant Herbert Greenfield, owner of Thrifty Cosmetics & Sundries ("Thrifty"). Specifically, in October 1994, Irving's son, defendant Josef Goldstein, made arrangements for Micro to borrow over $600,000 from Thrifty in order to finance the New York State Contract. (Tr. 2269–73, 2903–05, GX 905, 908, 910.) Between October 28, 1994 and November 16, 1994, Greenfield loaned to Micro a total of $660,000 ("the Greenfield loan"). (Tr. 2928–31, 3232–33; GX 916, 1600–02.)

In the course of seeking additional financing for Micro, in early December 1994, Josef Goldstein and William Jacob, Micro's relatively recently employed CEO, were referred to Fidelity Funding of California ("Fidelity"), an asset-based lender located in Dallas, Texas. The funds that Fidelity loaned to its customers were secured by the customers' assets, typically the customers' accounts receivable. Fidelity's general practice was to enter into a purchase and sale agreement with each customer, pursuant to which it would purchase the customer's accounts receivable and loan the customer money against those accounts receivable. In order to obtain financing, Jacob sent to Fidelity "aging" reports listing accounts receivable of both Micro and Maxum. (Tr. 383–86, 2292–98.) The Micro aging report listed, among others, two invoices purporting to reflect $600,000 in sales to Masel Supply Company ("Masel"), a photographic supply company owned by Irving Goldstein's brother-in-law, defendant Michael Mendlovic. (GX 1136 J.) The Maxum aging report listed six invoices purporting to reflect $470,000 in sales to Masel. (Tr. 387–92, 2294–97; GX 1136K.) Before the aging reports were sent to Fidelity, Reinhold wrote on both of them that Masel was a "major account" that exported computers to Europe and South America. (Tr. 2295–97 GX 1136J, 1136K.) However, Micro had never sold computers to Masel, and Masel did not export computers overseas. (Tr. 208–10, 2258–61, 3499–501.)

Unaware of the fraudulent nature of the aging reports, Fidelity, as part of its due diligence, began to conduct an investigation of Micro as a potential customer. Specifically, two Fidelity representatives visited Micro in December 1994, and at that time, Jacob and Reinhold assured both of Fidelity's representatives that the Masel invoices listed on the aging reports represented legitimate transactions. (Tr. 495, 674–75, 706–14, 2304–06.) Similarly, when contacted by a Fidelity representative in December 1994, Mendlovic confirmed via facsimile the invoice amounts listed on the aging reports and confirmed that Masel would pay the invoices. (Tr. 1425–

28, 3531–32; GX 262, 264, 265.) [1]

Relying to a large extent on the assurances of Reinhold, Mendlovic and Jacob, Fidelity, by agreements executed January 12, 1995, agreed to purchase up to $6.25 million of Micro and Maxum accounts receivable and to advance to the companies 80% of the face value of those receivables, an amount up to $5 million. (Tr. 507–09; GX 63, 65.)

## II. The Submission of Fraudulent Invoices

As a result of such devious conduct, Micro secured Fidelity's agreement to provide financing. Thereafter, Micro submitted to Fidelity numerous fraudulent invoices, each representing a non-existent account receivable. According to the trial testimony of William Jacob, the idea to defraud Fidelity in this way was first proposed by defendant Josef Goldstein in January 1995. (Tr. 2324–25.) Jacob testified that Josef Goldstein came into Micro's offices and announced that he and his father, Irving Goldstein, had an idea "to issue invoices for product that had not been shipped," and explained that "since Fidelity would advance funds on those particular invoices of 80 percent, we would collect that kind of money and put that in our account, and in turn pay off those people who were pressing us for payment . . . ." (Tr. 2324.) According to Jacob, he, Reinhold and Mendel Kotlarsky, the Secretary and Treasurer of Micro, opposed Goldstein's plan because they thought it would not work, and, as Jacob pointed out, could subject them to criminal liability. Nevertheless, Josef Goldstein prevailed and the plan was adopted. (Tr. 2325–26.)

Mendlovic's company, Masel, Greenfield's company, Thrifty Cosmetics, and defendant United Talmudical Academy of Boro Park ("UTA"), a yeshiva with close ties to Irving Goldstein, all agreed to pose as Micro account debtors for purposes of the submission of fraudulent invoices to Fidelity. (Tr. 2343–45, 2366, 2387, 2389–90.) Almost every day between January 1995 and July 1995, Micro sent Fidelity schedules of accounts which included fraudulent invoices corresponding to wholly fictitious transactions with account debtors such as Masel, Thrifty and the UTA. (Tr. 1429, 2394, 2947–51, 2357; GX 412–461.) After receiving the schedules and supporting documentation, Fidelity advanced funds to Micro. (Tr. 904–06, 1430–31.) In order to verify the Micro receivables, Joanne Jernigan, a verifications specialist at Fidelity, called the account debtors responsible for the oldest and/or largest invoices to verify the validity of the invoices and to inquire as to when they would be paid. (Tr. 1416–22.) In response to Jernigan's inquiries, representatives of the various account debtors, including Herbert Greenfield's wife, Sylvia Greenfield, Thrifty's bookkeeper, Jeffrey Weiss, and two bookkeepers at Masel, Solomon Einhorn and Heshy Blum, assured her that they had received the invoices, that there was no problem with the underlying merchandise, and that the invoices would be paid. (Tr. 1421, 1443–50, 1453–60, 1466–70, 1720–29, 1782, 1876–77; GX 259, 275.)

In order to conceal and perpetuate the fraud, both Thrifty and Masel paid some of the fraudulent Micro invoices with funds that had been provided to them surreptitiously by Micro. Thus, Micro transferred funds to Thrifty by issuing checks to another company owned by Greenfield, Joe Klein Dental Supply ("Joe Klein") (Tr. 2405–08, 2413–16, 3008–12, 3054–61, 3362–67; GX 18, 21–22, 801, 934, 938), and transferred funds to Masel by issuing checks to "MS Corp." and "SAR Enterprises" (Tr. 2416–20, 3270–73, 3290–94, 3298–301, 3356–62; GX 10, 13–17, 858, 864–65, 868, 870, 872, 875–78). Between April 24, 1995 and July 17, 1995, Thrifty issued five checks to Micro purporting to pay over $743,000 worth of past due invoices. (GX 918, 926, 929, 768, 280.) Between February 10, 1995 and July 13, 1995, Masel issued ten checks to Micro, all of which were signed by Mendlovic, totalling over $1.7 million in payment of Micro invoices. (Tr. 3268–89, GX 857, 833, 859, 861–63, 867, 869, 871, 269.)

---

**1.** Mendlovic later gave Fidelity the same assurances in a telephone conversation on January 17, 1995. (Tr. 859–63.)

### III. The Fraud Exposed

In addition to the invoices addressed to Thrifty, Masel and the UTA, Micro also submitted to Fidelity fraudulent invoices addressed to actual Micro customers including Atlantic Logic, a computer company that paid Micro in advance for all merchandise that it purchased. (Tr.1957, 2387–88.) It was this misstep that eventually caused the scheme to unravel.

By July 1995, Micro's outstanding balance with Fidelity was over the $5 million amount set out in the agreements, and Reinhold asked Richard Fletcher, President and owner of Atlantic Logic, who had been hired by Micro as a consultant, to assist Micro in negotiating an extension of the agreement with Fidelity. (Tr. 960–61, 987–92, 999, 1952–56, 2440.) In a telephone conversation on July 18, 1995, Jim Johnson of Fidelity informed Fletcher that approximately $200,000 in Atlantic Logic invoices were approaching ninety days past due. (Tr.. 1000–01, 1958–59.) Fletcher, knowing that Atlantic Logic had prepaid for all merchandise, was surprised by Johnson's comment. (Tr.1959.) At the conclusion of the telephone conversation with Johnson, Fletcher confirmed with his accounting department that Atlantic Logic did not owe Micro anything, and then went to Micro's offices to confront Reinhold with the apparent discrepancy. (Tr.1959.) Reinhold acknowledged to Fletcher that Atlantic Logic had no outstanding bills to Micro and also acknowledged certain "irregularities and problems" at Micro. (Tr.1960–61.) At a meeting at Micro's offices later that day, Reinhold and Kotlarsky admitted to Fletcher that Micro had financed approximately $950,000 in fraudulent Atlantic Logic invoices. (Tr.1962–63, 2432–34.) Reinhold then offered to provide Fletcher with the money to pay the Atlantic Logic invoices and also offered to "put money in [Fletcher's] pocket if [Fletcher] would play ball with him." (Tr. 1964.) Fletcher refused these offers and called Johnson and told him that all of Atlantic Logic's invoices had been prepaid and suggested that Johnson come to Micro's offices in New Jersey immediately because "he had a problem." (Tr. 1001, 1964–65.) Later that day, Kotlarsky admitted to Fletcher that Micro had submitted a total of approximately $5,500,000 in fraudulent invoices to Fidelity. (Tr.1966.)

The next day, July 19, 1995, Johnson met with Reinhold, Kotlarsky, Jacob and Fletcher at Atlantic Logic's offices. (Tr. 1004.) During the course of that meeting, Fletcher informed Johnson that Micro had submitted a total of approximately $5 million worth of fraudulent invoices. (Tr. 1004–07, 1974–75, 2439–40.) When Johnson asked Reinhold how this happened, Reinhold explained that "it just got away from him." (Tr. 1006–07, 1975.) Shortly thereafter, Kotlarsky reviewed with Johnson a Micro aging report and highlighted all of the fraudulent invoices. (Tr. 1015–1023, 1975–80; GX 243.) The outstanding invoices at that point included approximately $1,067,000 worth of invoices addressed to Masel, in excess of $707,000 in invoices addressed to Thrifty, and over $933,000 in invoices addressed to the UTA. (GX 1142, 1144, 1146.) Because of the 80% advance rate, Fidelity's loss attributable to these accounts was approximately $853,000, $565,000, and $746,000 respectively.

### IV. The Criminal Prosecution

On May 14, 1997, Kotlarsky, who had been separately indicted (97 Cr. 0304(JSR)), entered a plea of guilty to a one-count Information charging him with participating in a conspiracy to submit fraudulent invoices to Fidelity. In his plea allocution, Kotlarsky stated that he had been told that Micro needed to create fraudulent invoices in connection with a loan and stated that he assisted the scheme by signing fraudulent bills of lading and by taking information to Micro's data entry department. (Transcript of May 14, 1997 ("5/14/97 Tr.") at 14.) He also admitted that he had acted "in conjunction with other people" in this scheme. (5/14/97 Tr. at 15.)

On July 15, 1997, all of the defendants in the captioned matter were indicted for conspiracy to commit wire fraud in connection with the Fidelity scheme. On December 16, 1997 the Grand Jury returned a second superseding indictment charging multiple conspiracies and numerous counts of wire fraud.

On March 6, 1998, Irving Goldstein entered a plea of guilty to three separate conspiracy counts charged in a superseding Information, the first count of which charged him with participating in a conspiracy to submit fraudulent invoices to Fidelity. During his allocution, Irving Goldstein stated that, in order to help Micro get funds from Fidelity, he agreed "with others that UTA would accept false invoices from Micro Innovation, Inc." reflecting the shipment of computers "that were not shipped." He also admitted that he transferred funds from UTA for its use in paying the fraudulent invoices. (Transcript of March 6, 1998 ("3/6/98 Tr.") at 22.)

On February 17, 1998, UTA also entered a plea of guilty to Count Four of the Indictment, which charged it with conspiracy to commit wire fraud in connection with the submission to Fidelity of fraudulent invoices addressed to UTA.

On April 22, 1998, after a five week trial, Reinhold, Josef Goldstein, Mendlovic and Greenfield were convicted of all counts against them. Reinhold and Goldstein were convicted of Count One, which charged them with participating in a "hub" conspiracy to defraud Fidelity. Mendlovic and Greenfield were convicted of Counts Two and Three, respectively, which charged them with participating in separate "spoke" conspiracies to defraud Fidelity. In addition, Reinhold was convicted of Counts Five through Seventeen, Mendlovic was convicted of Counts Five through Eight, Josef Goldstein was convicted of Counts Nine through Seventeen, and Greenfield was convicted of Counts Nine through Twelve, all of which charged substantive counts of wire fraud. Jacob, having pled guilty pursuant to a plea and cooperation agreement with the Government, testified at trial as the Government's main witness.

On April 22, 1998, immediately after the jury rendered its verdict, counsel for defendant Greenfield stated his intention to file a motion to set aside the verdict pursuant to Rule 33. (Tr. 4417.) The Court then granted all defendants until May 22, 1998 to file post-verdict motions and provided the Government two weeks within which to respond. (Tr. 4417–18.) Except for Reinhold, who filed his post trial motion on May 12, 1998, all defendants, prior to May 22, 1998, sought, and obtained, extensions of the date for the filing of post-trial motions. The Government consented to all such requests. Motions on behalf of Goldstein and Mendlovic were filed on June 5, 1998. Greenfield retained new counsel for all post-trial proceedings and his motion was filed on June 22, 1998. The Government also sought, and obtained, with the consent of defense counsel, two extensions of time to file its response, which was filed on July 20, 1998.

## DISCUSSION

### I. Alleged Lack of Jurisdiction

■ As an initial matter, we reject the Government's contention that this Court is without jurisdiction to entertain the motions of defendants Goldstein, Greenfield and Mendlovic on the grounds that their motions were filed outside the permissible time limit set forth in the Federal Rules of Criminal Procedure.

> Rule 29 (c) states:
>
> If the jury returns a verdict of guilty ... a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period.

Rule 33 provides, in relevant part:

> A motion for a new trial made on any other grounds [other than newly discovered evidence] shall be made within 7 days after the verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

Finally, Rule 45(b) provides, in relevant part, that "the court may not extend the time for taking any action under Rules 29, 33, 34 and 35, except to the extent and under the conditions stated therein." The Government contends that under these rules, if a motion pursuant to Rule 29(c) or Rule 33 is not filed within the 7–day period, or by a date set during the 7–day period, the district court no longer has jurisdiction to consider the motion.

In addressing the issue of whether a district court may grant more than one extension for the filing of a Rule 33 motion, the Eleventh Circuit wrote "[i]t would appear that the trial court is in the best position to consider the need for the extension, and to perhaps continue an extension if done before it expires. The rule seems to contemplate unlimited discretion in the trial judge, since no outside time limitation is fixed for the extension." *United States v. DiBernardo,* 880 F.2d 1216, 1224 n. 3 (11th Cir.1989). The purpose of the time limitations contained in the relevant rules "is to ensure that the motion comes promptly after the verdict, in order to avoid ... imposition of sentence in advance of resolution of dispositive motions." *United States v. Hocking,* 841 F.2d 735, 736 (7th Cir.1988). In this case, immediately upon entry of the verdict, counsel for Greenfield expressed his intention to file a post-verdict motion and all defense counsel were given extensions of time in which to file such motions. All subsequent requests for extensions were made within the relevant deadlines and with the consent of the Government and the motions were fully submitted approximately one month in advance of the scheduled sentencing date for all the moving defendants. Under such circumstances, to reject the motions on procedural grounds would elevate form over substance. *See United States v. Galgano,* 281 F.2d 908, 912 (2d Cir.1960) (in applying Federal Rules of Criminal Procedure, courts should not "exalt form over substance"). Accordingly, we address the merits of the motions.

## II. The Goldstein and Kotlarsky Plea Allocutions

■ Josef Goldstein, joined by his co-defendants, challenges his conviction on the grounds that (1) the introduction at trial of the plea allocutions of Irving Goldstein and Mendel Kotlarsky violated his Sixth Amendment right to confrontation, (2) Irving Goldstein's allocution was "suspect" and should not have been admitted due to his allegedly diminished mental capacity and (3) the allocutions should have been excluded as unfairly prejudicial under Federal Rule of Evidence 403.

■ The admission of plea allocutions to prove a conspiracy clearly raises serious Sixth Amendment concerns. Nevertheless, as the Second Circuit has held, the Confrontation Clause is generally not violated by the admission of a statement that is sufficiently reliable to be covered by the "statement against penal interest" exception to the hearsay rule. *United States v. Stratton,* 779 F.2d 820, 830 (2d Cir.1985). A declaration against interest is not excludable as hearsay provided that

(1) the declarant is unavailable as a witness; (2) the statement is sufficiently contrary to the declarant's pecuniary or penal interests that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) corroborating circumstances indicate that the statement is trustworthy.

*Id.* at 828.

In this case, all three conditions were met. First, there is no dispute that Irving Goldstein and Kotlarsky were not available to testify. Second, even though Kotlarsky and Irving Goldstein may have received a legal benefit by pleading guilty, the plea allocutions directly subjected them to serious criminal liability and were thus contrary to their penal interests. *See United States v. Scopo,* 861 F.2d 339, 348 (2d Cir.198) ("a plea of guilty is a statement against the penal interest of the pleader for the obvious reason that it exposes him to criminal liability"). Finally, and most importantly, the allocutions, which did not mention any of the defendants by name, were supported by substantial corroborating evidence.

Indeed, prior to trial, Josef Goldstein's counsel conceded the volume of corroborating evidence when he argued against admission of the allocutions on the grounds that the Government "hardly needs Irving Goldstein's allocution as evidence that a conspiracy existed" and went on to assert that "[t]he cumulative nature of the evidence" was "enough in and of itself" to preclude the introduction of Irving Goldstein's plea allocution. (Letter of Elkan Abramowitz, Esq. dated March 13, 1998 at 4.) This corroborating evidence included, *inter alia,* the testimony of Jacob and Fletcher regarding the cre-

ation of fraudulent invoices (Tr.1962–1967 and 2394–95), the testimony of Rachel Klagsbrun, the accounts payable bookkeeper at UTA, regarding Irving Goldstein's directions to have UTA pay Micro invoices, and Irving Goldstein's role as a conduit for funds from Micro to UTA (Tr. 2788–2806), the testimony of Yisroel Levine, whose responsibilities at Micro included oversight of warehousing and shipping of product, regarding the creation of forged bills of lading (Tr. 1630–33, 1639–40), and the testimony of Karen Houseworth, formerly a data entry clerk at Micro, regarding Kotlarsky's directions to her to prepare invoices which were eventually submitted to Fidelity (Tr. 2941–2952). Josef Goldstein's participation in the scheme was also established by Jacob's testimony that Josef Goldstein initiated the scheme to defraud Fidelity by submitting fraudulent invoices (Tr.2324), participated in frequent discussions regarding the submission of invoices to Fidelity (Tr. 2395), recruited Greenfield's participation in the scheme (Tr. 2344–45), and suggested and approved the idea of using Joe Klein Dental to funnel money to Thrifty to pay the fraudulent invoices submitted to Fidelity (Tr. 2407). Goldstein's participation in the scheme was further established through Fletcher's testimony that Josef Goldstein suggested concealing the fraud from Fidelity by creating "credit memos" for the fraudulent account debtors. (Tr.1968–70.) In light of this overwhelming evidence, the allocutions were hardly "crucial" to the Government case, or "devastating" to the defense. Indeed, in his latest submission, Josef Goldstein has again conceded the limited value of Irving Goldstein's allocution, characterizing it as a "bare-bones statement" (Goldstein Reply Letter dated August 21, 1998 ("Goldstein Reply") at 8) and a "minimal recitation" that "deals only with UTA–Micro transactions and is silent as to the broader allegations contained in Count One of the Second Superseding Indictment." (Goldstein Reply at 6 n. 3.)

The cases relied on by defendants, *United States v. Thomas,* 998 F.2d 1202 (3rd Cir. 1993), and *United States v. Moustakis,* 864 F.Supp. 390 (S.D.N.Y.1994), are inapposite. In *Thomas,* the Third Circuit held that introduction of evidence of the guilty pleas of the defendant's co-conspirators was error where

the co-conspirators took the stand at trial, admitted their participation in the conspiracy, and the guilty pleas were introduced solely to prove the defendant's intent. 998 F.2d at 1206. In this case, by contrast, neither Irving Goldstein nor Kotlarsky testified at trial, and the allocutions were introduced with regard to the limited issue of proving the existence and time period of the conspiracy. (Tr. 2834–35.) Also, in contrast to *Thomas,* in which the allocutions were introduced to prove the critical issue of the defendant's intent, the jury in this case was given the following instruction upon introduction of the allocutions:

> The question whether Isaac Reinhold or Josef Goldstein are also members of th[e] conspiracy is an issue as to which you will have to rely on other evidence. There is no evidence in these statements that [were] just read to you naming any other defendant. Guilt is personal, and the admission [sic] of Irving Goldstein and Mendel Kotlarsky do not constitute admissions of any nature against Isaac Reinhold or Josef Goldstein, and should be weighed with caution.

> If you find, based in part on these statements, that the conspiracy charged in Count One of the indictment existed, you must decide as a separate question whether Isaac Reinhold or Josef Goldstein were a part of the alleged conspiracy based entirely on other evidence in the case. There is nothing in these statements ... that answers that question one way or the other.

(Tr. 2835.)

In *Moustakis,* the Government offered "no testimony or other evidence" to corroborate the relevant part of the allocution, which was offered to prove the necessary interstate element of a conspiracy to transport stolen art out of state. 864 F.Supp. at 397. In this case, by contrast, as set forth above, the allocutions were supported by overwhelming evidence, and were accompanied by a limiting instruction directing the jury not to consider them as evidence of the defendants' participation in the conspiracy.

Josef Goldstein's argument that Irving Goldstein's allocution should not have been admitted because he was suffering from diminished capacity at the time of the allocution is also unpersuasive. In January 1998, Irving Goldstein moved this Court for a declaration pursuant to 18 U.S.C. § 4241 finding him not competent to stand trial. Specifically, he contended that as a result of an automobile accident in July 1987, his mental condition had deteriorated to the point where he was unable to understand and appreciate the criminal charges against him. In connection with Irving Goldstein's motion, the Court undertook a thorough examination of his mental condition and reviewed reports submitted by two Government expert psychiatrists and two defense expert psychiatrists as well as affidavits by two attorneys representing Mr. Goldstein. In addition, at a hearing conducted over three days, the Court heard extensive and detailed testimony from both parties' experts, Irving Goldstein's attorneys, and an FBI Special Agent. On the basis of this substantial record, the Court found that although Mr. Goldstein was likely suffering from depression, he was, nevertheless, clearly competent to stand trial. (*See* Memorandum Order dated February 27, 1998.) The Court is unaware of any evidence that would warrant reconsideration of that conclusion.

Moreover, at the plea, Irving Goldstein's counsel assured the Court that "Mr. Goldstein understands the nature of my application [to withdraw his earlier plea of not guilty and enter a plea of guilty], he understands what is to occur here this morning, and he understands the nature and consequence of this proceeding." (3/6/98 Tr. at 3.) Immediately prior to his allocution, Mr. Goldstein affirmed that he was not under the care of a doctor or psychiatrist and that he had never been treated for any form of mental illness. (3/6/98 Tr. at 6–7.) He answered all questions posed by the Court lucidly and was able, through counsel, to explain the difference between his pre-Chapter 11 role with 47th Street and his post-Chapter 11 role. (3/6/98 Tr. at 6.) Considering the "totality of the circumstances," including the Court's pri-

or competency finding, the substantial corroborating evidence, and the representations of Mr. Goldstein's counsel at the plea, this Court finds no reason to doubt the reliability of Irving Goldstein's plea allocution.

■ Finally, Josef Goldstein also argues that Irving Goldstein's plea allocution was "highly inflammatory" and prejudicial because, given their father-son relationship, the jury would necessarily conclude that Josef was one of the "others" mentioned in Irving Goldstein's allocution. (Josef Goldstein Motion of June 5, 1998 ("Goldstein Mot.") at 8–9.) This argument is unpersuasive. First, Josef Goldstein's contention that the plea was "highly inflammatory" and prejudicial is undermined by his simultaneous contention that it was a "bare-bones statement" (Goldstein Reply at 8) and "a highly technical and minimal recitation of the allegations in the indictment" (Goldstein Reply at 6 n. 3.) Moreover, nothing in Irving Goldstein's allocution in any way suggests that Josef Goldstein was one of the "others" with whom Irving Goldstein conspired. Indeed, as Josef Goldstein's counsel stated in his opening to the jury, "human nature and human understanding" suggest that it is unlikely that Irving Goldstein would have enlisted his son in the scheme to defraud Fidelity. (Tr. 65.) As Josef Goldstein concedes, in *United States v. Winley*, 638 F.2d 560, 562 (2d Cir.1981), and *United States v. Gallego*, 913 F.Supp. 209, 212–213 (S.D.N.Y.1996), plea allocutions that implicated the declarants' brothers were held admissible despite the potential prejudice resulting from the family relationships at issue, and Josef Goldstein has not identified any case in which allocution of a relative was excluded because of the allocator's family relationship to the defendant.[2]

In short, the "totality of the circumstances," including the "minimal" nature of Irving Goldstein's allocution, the limiting instruction given in connection with the allocution, and the substantial evidence against Josef Goldstein, leaves this Court with little doubt that Josef Goldstein was convicted

---

**2.** For the same reasons, the Court also rejects Mendlovic's argument that Irving Goldstein's plea allocution should not have been admitted

because Mendlovic is Irving Goldstein's brother-in-law. (*See* Letter of Frederick P. Hafetz dated June 5, 1998, at 2.)

based on the evidence against him and not because of any unwarranted conclusion drawn by the jury from his father's plea allocution.

## III. Josef Goldstein's Motion for a New Trial

Josef Goldstein has also moved for a new trial pursuant to Fed.R.Crim.P. 33 on the grounds that the Government's main witness against him, William Jacob, testified falsely about Josef Goldstein's participation in the scheme to defraud Fidelity.

■ In making this challenge, Josef Goldstein's burden is a heavy one. As the Second Circuit has held, "motions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir.1995), *cert. denied*, 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996), and should be granted only "in the most extraordinary circumstances" in order to prevent a "manifest injustice." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992). A district court should exercise "great caution" in considering such a motion and need not grant the motion even if "all or part of the testimony of a witness or witnesses" is found to be incredible. *Id.* Thus, a new trial should not be granted on the grounds of perjured Government testimony absent a showing "that the jury probably would have acquitted in the absence of the false testimony." *Id.* As the Second Circuit stated, "[i]t is only in the rare instance where it can be shown that the prosecution knowingly used false testimony that we would apply a less stringent test and permit the granting of a new trial where the jury 'might' have acquitted absent the perjury." *Id.*

Goldstein attacks Jacob's credibility on several grounds. First, Goldstein challenges as "patently incredible" Jacob's testimony that the idea of submitting fraudulent invoices to Fidelity was first proposed by Josef Goldstein in January 1995. Goldstein argues that Micro had been submitting Masel invoices, which did not reflect an actual physical transfer of merchandise, to Bank Hapoalim since 1991 and thus contends that this idea could not have first been proposed by him in January 1995. Goldstein points out

that Jacob originally told the Government that this conversation took place in February 1995, but at trial testified that it took place in January 1995. (Tr. 2606–2610.)

Second, Goldstein challenges Jacob's testimony that he "overheard" a conversation in English between Reinhold and Josef Goldstein regarding the use of UTA and Masel as account debtors on the grounds that evidence at trial indicated that Reinhold and Goldstein "frequently" spoke to each other in Yiddish. (Tr. 2661.) Goldstein further argues that Jacob's testimony was contradicted by testimony of the UTA and Masel bookkeepers to the effect that they never had any dealings with Josef Goldstein. (Tr. 3240, 2746, 2965–66.)

Finally, Goldstein challenges Jacob's testimony that Josef Goldstein used the bank account of an entity, BSD Acquisitions, to "funnel" money to Thrifty Cosmetics in order to fund Thrifty's payment of invoices to Fidelity (Tr. 2578) on the grounds that this testimony was contradicted by other evidence that the BSD account was used only to make payments on the loan from Greenfield to Micro that Josef Goldstein had personally guaranteed. (*See* GX 916, Tr. 3372.)

Contrary to Josef Goldstein's contentions, this Court is of the view that the jury was justified in relying upon Jacob's testimony. The witness was careful, candid, forthcoming and persuasive on both direct and cross-examination. His testimony carefully distinguished between what he could recall and what he could not, and included acknowledgements that he had not been truthful at all times in his meetings with the Government. Notwithstanding that, his testimony and demeanor were, in the Court's view, entirely worthy of acceptance by the jury.

■ The alleged inconsistencies in Jacob's testimony, in any event, do not render Josef Goldstein's conviction a "manifest injustice" warranting a new trial, especially in light of all of the other evidence connecting Josef Goldstein to the scheme. This evidence includes Jacob's testimony that Josef Goldstein recruited Greenfield's participation in the scheme (Tr. 2344–45), suggested using the funds fraudulently obtained from Fidelity to

pay off the Greenfield loan because Micro was "getting bombarded from the Greenfields" (Tr. 2359), participated in frequent discussions regarding the submission of invoices to Fidelity (Tr. 2395), and suggested and approved the idea of using Joe Klein Dental to funnel money to Thrifty to pay the Micro invoices (Tr. 2407). Goldstein has not offered any specific challenge to this testimony.[3] The evidence linking Josef Goldstein to the fraud also includes Fletcher's testimony, not challenged on this motion, that Joseph Goldstein suggested concealing the fraud from Fidelity by creating "credit memos" for the fraudulent account debtors. (Tr.1968–70.)

■ With regard to Josef Goldstein's next contention, the fact that Jacob testified that he overheard a conversation in English that arguably would have been held in Yiddish does not render his testimony so "patently incredible" as to warrant a new trial. While there was evidence that Reinhold and Goldstein "frequently" spoke in Yiddish, Josef Goldstein has offered no proof that they always did so.

■ Finally, Josef Goldstein's claim that Jacob's testimony must be rejected because he erroneously testified that the BSD account was used to fund Thrifty's payment of fraudulent invoices, when in fact the account was used to make payments on the Greenfield loan, is also unpersuasive. On cross-examination, Jacob agreed with defense counsel's characterization of his direct testimony that BSD was "used to funnel money through Micro and back to the companies used in the obtaining of financing from Fidelity." (Tr. 2578.) However, defense counsel's characterization was erroneous. When asked on direct examination why money was transferred to the BSD account, Jacob testified unambiguously "It was in order to make payments on the Greenfield loan against [sic] New York State contract." (Tr. 2365.) Jacob's apparent endorsement of defense counsel's characterization of his direct testimony provides no basis for rejecting Jacob's testimony as "patently incredible."

In short, Josef Goldstein's trial counsel forcefully and eloquently presented all of the contradictions in Jacob's testimony to the jury, which nevertheless found Jacob credible. In light of the Second Circuit's admonition that trial courts should generally defer to jury determinations of credibility, Mr. Goldstein's motion for a new trial is denied. *Sanchez,* 969 F.2d at 1414.

## IV. Greenfield's Motion for a Judgment of Acquittal

Herbert Greenfield moves for a judgment of acquittal pursuant to Rule 29 on the grounds that the evidence against him failed to establish that he harbored specific intent to defraud Fidelity. Fed.R.Crim.P. 29 provides, in pertinent part, that a Court "shall order the entry of judgment of acquittal ... after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Fed. R.Crim.P. 29(a). A defendant bears a heavy burden in challenging a conviction based on insufficient evidence. A conviction must be upheld "if, after viewing the evidence in the light most favorable to the Government, and drawing all reasonable inferences in its favor, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Medina,* 944 F.2d 60, 66 (2d Cir.1991) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Thus, a reviewing court must "review the evidence in the light most favorable to the Government and credit every inference that the jury might have drawn in the government's favor." *United States v. Salameh,* 152 F.3d 88, 151, 1998 WL 440473, at *54 (2d Cir.1998) (citations omitted). The court must defer to the jury's decisions regarding the permissible competing inferences that can be drawn from the evidence. *See, e.g., United States v. Taylor,* 18 F.3d 55, 57–58 (2d Cir.1994); *United States v. Matthews,* 20 F.3d 538, 548 (2d Cir.1994). Further, "pieces of evidence must be viewed in conjunction, not in isolation." *United States v. Abelis,* 146 F.3d 73,

---

**3.** Although Goldstein now claims that "all of Jacob's testimony inculpating Josef Goldstein is incredible" (Goldstein Reply at 14 n.8), he has not offered any reason to reject any part of that testimony beyond the examples cited.

80 (2d Cir.1998) (quoting *United States v. Podlog,* 35 F.3d 699, 705 (2d Cir.1994)).

"Deference to the jury's verdict is especially due when reviewing a conspiracy conviction because conspiracies are 'secretive operations, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Salameh,* 1998 WL 440473, at *54, 152 F.3d at 151 (quoting *United States v. Pitre,* 960 F.2d 1112, 1120 (2d Cir.1992)). "To convict a defendant as a member of a conspiracy, the government must prove that the defendant 'agreed on the essential nature of the plan.'" *Salameh,* 1998 WL 440473, at * 54, 152 F.3d at 151 (quoting *United States v. Gleason,* 616 F.2d 2, 16 (2d Cir.1979)). "Once a conspiracy is shown, only slight evidence is needed to link another defendant with it." *Salameh,* 1998 WL 440473, at *54, 152 F.3d at 151 (quoting *United States v. Roldan–Zapata,* 916 F.2d 795, 802 (2d Cir.1990)). Thus, "a defendant's ... presence may establish his membership in the conspiracy if all of the circumstances considered together show that by his presence he meant to advance the goals of that conspiracy." *Abelis,* 146 F.3d at 80 (quoting *United States v. Giraldo,* 80 F.3d 667, 673 (2d Cir.1996)). "Moreover, the government may prove membership in a conspiracy by circumstantial evidence alone, and a defendant may be convicted of conspiracy even though he is unaware of all the conspiracy's unlawful aims...." *United States v. Khan,* 53 F.3d 507, 513 (2d Cir.1995). Finally, "dissension among coconspirators does not change the fact that the conspiracy existed or that a given individual was a member of it." *Abelis,* 146 F.3d at 81.

To sustain a conviction on substantive wire fraud charges, the Government " 'must present proof that the defendant[ ] possessed a fraudulent intent ....' " *United States v. Zagari,* 111 F.3d 307, 327 (2d Cir.1997) (quoting *United States v. Wallach,* 935 F.2d 445, 461 (2d Cir.1991)), *cert. denied,* — U.S. ——, 118 S.Ct. 445, 139 L.Ed.2d 381, 390 (1997). "[S]pecific intent need not necessarily be proved by direct evidence, but may be inferred from the defendant's actions and other circumstantial evidence." *United States v. Gelb,* 700 F.2d 875, 880 (2d Cir. 1983).

█ Finally, a conviction should not be vacated under Rule 29 simply because the government's case is based on circumstantial evidence and the defendant is able to present an equally plausible, innocent explanation of that evidence. As the Second Circuit has held, "[t]here is no requirement ... that a finding of guilt by a district court 'exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.'" *United States v. Davis,* 8 F.3d 923, 928–29 (2d Cir.1993) (citations omitted). Furthermore, "crimes may be proven entirely by circumstantial evidence. It is thus established that a prosecution for murder may succeed without a body having been found or without evidence of the means of death being provided." *United States v. Sureff,* 15 F.3d 225, 228 (2d Cir. 1994) (citations omitted). "So long as, from inferences reasonably drawn, the jury could fairly have found beyond a reasonable doubt that the defendant engaged in the charged criminal conduct, a conviction based on circumstantial evidence *must* be sustained." *Id.* (emphasis added). Thus, the view that circumstantial evidence is inherently weaker than direct evidence is "baseless" and "[c]ircumstantial evidence is thus not a disfavored form of proof." *Id.* at 229.

When juxtaposed with the facts of this case, the cases relied upon by Greenfield highlight the strength of the Government's evidence. In all of the cases cited by Greenfield, the Government lacked evidence linking the defendant to the fraudulent scheme. For example, in *United States v. Wrehe,* 628 F.2d 1079, 1084 (8th Cir.1980), which involved a fraudulent loan brokerage business, the Eighth Circuit reversed conspiracy and fraud verdicts against one defendant, a bookkeeper, because there was "absolutely no evidence" that she played any part in substantive decision making at the company responsible for the fraud and her only official act on behalf of the company was to sign a single contract unrelated to the fraudulent scheme. In *United States v. Piepgrass,* 425 F.2d 194, 199–200 (9th Cir.1970), the Ninth Circuit reversed the conviction of one defen-

dant for committing securities and mail fraud where the evidence against him only supported an inference that he "could have been aware" of certain transactions and the Government failed to establish any rational nexus between what he could have known and a specific intent to defraud. In *United States v. Casperson*, 773 F.2d 216, 221 (8th Cir.1985), the Eighth Circuit reversed a defendant's conviction for mail fraud and conspiracy where "the record contain[ed] no evidence that he was a knowing participant in a fraudulent scheme," his participation in the operation was purely "clerical," and few of the Government's witnesses could identify him or even recognize his name. In *United States v. Parker*, 839 F.2d 1473 (11th Cir. 1988), in which the Eleventh Circuit reversed the convictions of several defendants for conspiracy to commit fraud, the Government's "best evidence" of the conspiracy was a meeting among the defendants which supposedly gave birth to the conspiracy. However, two Government witnesses present at the meeting "testified that nothing was said at the meeting that would give rise to suspicion" and "no evidence suggest[ed] that the meeting was the birthplace of a conspiracy ...." *Id.* at 1478. In *United States v. Klein*, 515 F.2d 751, 755–57 (3rd Cir.1975), the Third Circuit overturned a conviction for conspiracy to defraud where the evidence "simply gave rise to no inferences" that the defendant had knowledge of the conspiracy, part of the government's evidence was a prior conviction that was erroneously admitted, and "the chief government witness gave no testimony implicating [the defendant] in the conspiracy ...." In *United States v. Franklin*, 608 F.2d 241, 245 (6th Cir.1979), the Sixth Circuit reversed a conviction for conspiracy to commit bank fraud where the Government presented "no evidence to suggest that [the defendant] was familiar with or even remotely aware of any of the facts" surrounding the scheme. Finally, in *United States v. Rosenblatt*, 554 F.2d 36, 37–8 (2d Cir.1977) it was undisputed that the alleged conspirators had not entered into "any agreement ... concerning the type of fraud in which they were engaged" and the Government stipulated that one alleged conspir-

ator did not know the truth about the other's fraudulent activities.

 By contrast, in this case, the Government presented evidence that

(1) Josef Goldstein told Reinhold and Jacob that Greenfield had agreed to participate in the scheme and to have Micro "bill" Thrifty as part of that scheme (Tr. 2343–44, 2689);

(2) Micro submitted to Fidelity approximately twenty-four fraudulent Thrifty invoices totalling over $1.5 million between January 30, 1995 and July 17, 1995. These invoices were mailed to Thrifty where they were received by Thrifty's bookkeeper, Jeffrey Weiss, and reviewed by Greenfield (Tr. 1430–31, 1460–64, 2969–72, GX 510–545);

(3) Greenfield approved payment of the Micro invoices and signed numerous checks to Micro in amounts dictated by Reinhold, even though Thrifty had never purchased any merchandise from Micro. Before making the first such payment, Greenfield instructed Weiss to prepare checks and personally approved and signed each of the checks before it was sent out (Tr. 2918–21, 2993–98);

(4) Greenfield instructed Weiss not to send out any checks to Micro until he was certain that Thrifty would receive funds from Micro to cover those checks (Tr. 2998–3001, 3021–26, 3031–32);

(5) Thrifty received funds from Micro via the circuitous route of payments by Micro to the BSD account, followed by BSD's payment of money to Joe Klein Dental, and the subsequent payment by Joe Klein Dental to Thrifty (*see* Herbert Greenfield's Reply Memorandum of Law ("Greenfield Reply") at 11); and

(6) Greenfield's wife, Sylvia, and Thrifty's bookkeeper confirmed the fraudulent Thrifty invoices when contacted by Jernigan (Tr. 1464–70, 1721–29; GX 275).

The Government also presented evidence that Mr. Greenfield was motivated to participate in the fraud by a desire to recover the

loan he had made to Micro, and identified a correlation between payments from Fidelity to Micro and payments from Micro to Thrifty in support of its theory that Thrifty was paid with funds fraudulently obtained from Fidelity. Indeed, Micro made its first payment on the Thrifty loan within three days of the first fraudulent Thrifty invoice to Fidelity (Tr. 2933, 2968; GX 780, 916) and over the subsequent five week period, during which Micro submitted approximately $413,000 in fraudulent Thrifty invoices to Fidelity, Thrifty received approximately $450,000 from Micro (Tr. 3343–50; GX 2, 5, 6, 510, 512, 514, 516–18, 520.)

In light of the governing case law, the jury was clearly entitled to infer, on the basis of this evidence, that Herbert Greenfield knowingly agreed to participate in the scheme to defraud Fidelity.[4]

## V. Severance

■ All defendants have moved for new trials pursuant to Fed.R.Crim.P. 33 on the grounds that the Court erred in denying their repeated severance motions and that they were unfairly prejudiced by being tried together. The Second Circuit has recently summarized the law on this subject:

> There is a preference in the federal system for joint trials of defendants who are indicted together. This preference is especially strong where, as here, the defendants are alleged to have participated in a common plan or scheme. It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying and randomly favor-

ing the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.

*Salameh,* 1998 WL 440473, at *11, 152 F.3d at 115 (internal quotation marks and citations omitted). Thus, a conviction should not be reversed for improper denial of a severance motion unless the defendant "can show prejudice so severe that his conviction constituted a miscarriage of justice, and that the denial of his motion constituted an abuse of discretion." *Id.* (internal quotation marks and citations omitted). And reversal is not warranted if the defendant can only show that denial of the motion caused "some prejudice, but less than substantial prejudice ... since, by and large, joinder promotes judicial efficiency." *Id.* (internal quotation marks and citations omitted).

### (a) Prejudicial Spillover

■ Josef Goldstein, Mendlovic and Greenfield argue that they suffered prejudice as a result of the introduction of certain evidence that would not have been admissible had they been tried separately. The most important evidence in this category are Reinhold's "confessions" of the fraud made at the July 18 and 19 meetings with Fletcher and a highlighted· aging report identifying all of Micro's fraudulent transactions, which was presented to Johnson at the July 19 meeting. (Goldstein Mot. 10.) Goldstein contends that this evidence constituted the "backbone of the government's case" and that its admission was "devastating." This argument is unpersuasive.

There is no dispute that Reinhold's statements and the aging report were admissible against Reinhold since he was a participant in the July 18 and 19 meetings. (*See, e.g.,* Goldstein Mot. at 10.) However, at trial, the

---

4. In contrast to the cases cited by Greenfield, this case is more analogous to *United States v. Kane,* 944 F.2d 1406 (7th Cir.1991), which involved a conspiracy to obtain fraudulent auto loans on fictitious cars. Kane, who operated a used car business, was recruited to pose as the seller of the cars and to supply banks from which loans were sought with a description of the car and a vehicle identification number. *Id.* at 1409. Although he admitted to responding to inquiries from the banks, like Greenfield, he claimed that he had always been unaware of the illicit pur-

pose of the conspiracy and argued that the government's circumstantial evidence was insufficient to establish his knowing participation in the scheme. *Id.* at 1410. However, the Seventh Circuit, noting that "[c]redibility determinations are within the jury's special province," held that the jury was entitled to reject his theory of the evidence and infer from the government's circumstantial evidence that he understood the true purpose of the conspiracy and participated in it with the goal of stealing funds from the banks. *Id.* at 1411.

Government moved to admit these against all defendants as statements of co-conspirators made in furtherance of the conspiracy pursuant to Federal Rule of Evidence 801(d)(2). Relying on *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), the Court rejected this application on the grounds that the statements were made after the objectives of the conspiracy had been achieved. (Tr. 587–611.) Accordingly, each time Reinhold's "confessions" or the highlighted aging report were referred to by a witness, the Court instructed the jury to consider them "only as evidence of the activities of the persons who made the statements" and reminded the jury that "nothing in those statements, as far as we are concerned here ... relates or refers to the other defendants who are on trial." (Tr. 1101; *see also* Tr.1973–74 and 2437–39.). In addition, the Court took measures to limit the danger of any possible spillover prejudice resulting from either the July 18 and 19 statements (and any other evidence that was admissible against only one defendant) by instructing the jury in the final charge that:

> There are four defendants on trial here ... I instruct you that you must evaluate the guilt or innocence of each defendant separately. In particular, as jurors, you must determine whether the Government has proven beyond a reasonable doubt its case against one defendant, and then make an independent inquiry as to whether the Government has proven beyond a reasonable doubt its case against the other defendants. In other words, it is entirely possible that you could find that the Government has proven beyond a reasonable doubt its case against one defendant, but not the others.
>
> In addition, some of the evidence in this case was limited to one defendant. Let me emphasize that any evidence admitted solely against one defendant may be considered only as against that defendant and may not in any respect enter into your deliberations on any other defendant. The indictment contains sixteen separate counts. Each count charges a defendant with a different crime. There are four defendants on trial before you. You must, as a matter of law, consider each count of the indictment and each defendant's involvement in that count separately, and you must return a separate verdict on each defendant for each count in which he is charged.
>
> In reaching your verdict, bear in mind that guilt is personal and individual. Your verdict of guilty or not guilty must be based solely upon the evidence about each defendant. The case against each defendant, on each count, stands or falls upon the proof or lack of proof against that defendant alone, and your verdict as to any defendant on any count should not control your decision as to any other defendant or any other count. No other considerations are proper.

(Tr. 4308–10.) As the Supreme Court has held, "limiting instructions often will suffice to cure any risk of prejudice" at a joint trial. *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). This is so because it is an "almost invariable assumption of the law that jurors follow their instructions...." *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). With regard to a statement of a co-defendant that is not incriminating on its face, but becomes so "only when linked with evidence introduced later at trial," (like Reinhold's statements at the July 18 and 19 meetings) the Supreme Court has noted that "the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget." *Id.* at 208, 107 S.Ct. 1702. In this case, the Court gave repeated limiting instructions designed to prevent any possibility of prejudicial spillover from the introduction of evidence against only one defendant. In light of these repeated instructions and the other evidence against each of the moving defendants, the risk of prejudicial spillover was minimized and any spillover that occurred was certainly not so severe as to constitute a "miscarriage of justice."

**(b) Antagonistic Defenses**

▓▓▓ All defendants contend that they were the victims of antagonistic defenses. Goldstein argues that he suffered substantial

prejudice because his defense that no crime occurred was directly undermined by Reinhold's argument that a crime was committed but that he was not a part of it. Reinhold argues that he was prejudiced by Mendlovic's testimony that Reinhold had deceived him into participating in the fraud by telling him that the fraudulent invoices were supported by real merchandise for which Masel would be assuming responsibility. (Tr. 3524–30, 3538–39, 3556–58, 3676–77, 3684–85.) Goldstein, Mendlovic and Greenfield all contend that they were prejudiced by Reinhold's argument that the fraud was perpetrated by Irving Goldstein for the benefit of the Goldstein family and that Reinhold, as an outsider to the family, could not have participated in it. (*See, e.g.,* Tr. 4121.)

As the Second Circuit recently explained:

> Mutually antagonistic or irreconcilable defenses may be so prejudicial in some circumstances as to mandate severance. In order to make a showing of mutually antagonistic or irreconcilable defenses, the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of the other. However, mutually antagonistic defenses are not prejudicial per se. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion. The risk of prejudice will vary with the facts in each case and when the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but as the Supreme Court indicated in *Richardson v. Marsh,* less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.

*Salameh,* 1998 WL 440473, at *12, 152 F.3d at 116 (internal citations and quotation marks omitted). Finally, as the Supreme Court has held, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

*Salameh,* 1998 WL 440473, 152 F.3d 88, involved a multi-defendant conspiracy to blow up the World Trade Center complex in New York City. At trial, one defendant, Abouhalima, refused to concede that a bomb had blown up the World Trade Center. Another defendant, Salameh, conceded not only the existence of a bomb, but argued that he was the unwitting dupe of a third defendant, Yousef, who had masterminded the scheme and was identified as a close associate of Abouhalima. *Salameh,* 1998 WL 440473, at *13, 152 F.3d at 116. The Second Circuit rejected Abouhalima's claim that his defense was substantially undermined by Salameh, who admitted the existence of a bombing conspiracy and linked Abouhalima to that conspiracy. The court concluded that neither defense necessarily required the jury to reject the other and noted that "any possible prejudice was eliminated by the district court's repeated admonitions to the jury that each defendant's guilt had to be separately and individually considered." *Salameh,* 1998 WL 440473, at *13, 152 F.3d at 116.

The conflict among the defenses in this case was not nearly as clear as in *Salameh.* Reinhold presented no evidence inculpating any other defendant. Although they were in tension with one another, none of the defenses necessarily required that the jury reject the other defenses. The jury could have accepted Reinhold's theory that Irving Goldstein masterminded the scheme for the benefit of his family *and* Josef Goldstein's theory that the submission of invoices which were not backed by any merchandise but which represented an obligation on the part of the account debtors to pay Micro was not criminal *and* Mendlovic's theory that he confirmed Masel's invoices to Fidelity because he trusted Reinhold's word that the invoices reflected real merchandise. Indeed, in his Rule 33 motion, Josef Goldstein argues that none of the evidence proving that "Micro made no *actual* delivery of merchandise reported in some of its invoices," including evidence relating to the creation of fraudulent shipping documents, "is inconsistent with Josef Goldstein's argument that the invoices sent to Fidelity could have reflected ... constructive transactions." (Goldstein Reply at 5.) *See, e.g., United States v. Linn,*

31 F.3d 987, 992 (10th Cir.1994) (reversal on grounds of antagonistic defenses not warranted where "defenses simply are not so contradictory that the jury must have necessarily disbelieved one to believe another" and mutual antagonism "amounts to no more than finger pointing."). Finally, as in *Salameh*, the Court repeatedly instructed the jury that the evidence against each defendant was to be considered separately (*see, e.g.,* Tr. 4308–10) and that nothing that the lawyers said constituted evidence (*see* Tr. 4296, 4304).

## VI. Jury Charge

Finally, defendants move for a new trial on the grounds that three aspects of the Court's final jury instruction were erroneous as a matter of law.

### (a) Distinct Conspiracies

■ First, Greenfield argues that the Court erred in failing to give a "distinct conspiracies" charge, i.e, to charge the jury that it should consider each of the conspiracies charged in the indictment separately. This claim is unpersuasive. Fed.R.Crim.P. 30 states that "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Greenfield does not seriously dispute that he never requested a "distinct conspiracies" charge.[5] Accordingly, the defendants' challenge to the charge must be reviewed pursuant to Fed.R.Crim.P. 52(b), which provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the Court."

In order to ensure that the jury considered each conspiracy count and each defendant separately, the Court in the final charge instructed the jury that "[i]n this case, there are three conspiracies alleged in the Indictment. Thus, when considering a particular

defendant, you must find that the conspiracy in which that defendant is charged existed." (Tr. 4321.) The Court also instructed the jury:

> If you conclude that the Government has proven beyond a reasonable doubt that the conspiracy charged in the count you are considering existed—that is Count One, Count Two, or Count Three—you must next determine the second question, and that is whether the defendant you are considering participated in that conspiracy, the conspiracy in which he is charged, with knowledge of its unlawful purposes and in furtherance of its unlawful objectives. For example, if you find that the conspiracy charged in Count One existed, and you are considering a particular defendant, you must then decide whether that defendant participated in that conspiracy, and so on, considering each defendant with respect to the conspiracy with which he is charged.

(Tr. 4322.) The Court also gave the following more general instruction:

> There are four defendants on trial before you. You must, as a matter of law, consider each count of the indictment and each defendant's involvement in that count separately, and you must return a separate verdict on each defendant for each count in which he is charged.
>
> In reaching your verdict, bear in mind that guilt is personal and individual. Your verdict of guilty or not guilty must be based solely upon the evidence about each defendant. The case against each defendant, on each count, stands or falls upon the proof or lack of proof against that defendant alone, and your verdict as to any defendant on any count should not control your decision as to any other defendant or any other count. No other considerations are proper.

(Tr. 4309–10.) In light of these instructions, a more specific "distinct conspiracies" charge was unnecessary. The cases relied upon by Greenfield, *United States v. Lindsey*, 602

---

**5.** Mendlovic's motion, made in connection with the defendants' Rule 29 motions at the close of the Government's case, to preclude evidence of the broader conspiracy with respect to account debtors other than Masel "from being considered with respect to [Mendlovic]" (Tr. 3423–24) cannot be considered a Rule 30 objection, on behalf of Greenfield, to the absence of a "distinct conspiracies" charge.

F.2d 785 (7th Cir.1979), and *United States v. Nevils,* 897 F.2d 300 (8th Cir.1990), involved situations in which the indictments charged a single conspiracy, but the evidence at trial revealed the existence of multiple conspiracies. Under such circumstances, a "distinct conspiracies" charge is needed because there is a danger that a jury presented only with the options of acquitting the defendant or convicting him of a single, overarching conspiracy may unjustifiably choose the latter. In this case, however, the indictment charged separate conspiracies, the Government offered proof of separate conspiracies, and the jury was instructed to consider each conspiracy and each defendant's participation in that conspiracy separately. Accordingly, the failure to give a "distinct conspiracies" charge was not plainly erroneous.

**(b) "No Ultimate Harm"**

Second, Josef Goldstein, joined by Mendlovic and Greenfield, challenges, as erroneous, the following part of the jury charge relating to the defendants' "good faith" defense:

However, in considering whether or not a defendant acted in good faith, you are instructed that a belief by him, if you find that such a belief existed, that ultimately everything would work out so that no one would lose any money at the end of the day, does *not* require a finding that he acted in good faith if he had the specific intent to defraud as I've explained to you. No amount of honest belief on the part of the defendant that his venture will succeed in such a way that no one will, in the end, suffer any loss—for instance, that all outstanding loans to Fidelity would actually or eventually be paid—will *excuse* false and fraudulent representations by the defendant made with specific intent, that is, so long as you find that the defendant had the specific intent to deprive Fidelity of money or property, even in the short term, which includes depriving Fidelity of information material to its deciding how to use its assets.

(Tr. 4360–61.) Goldstein argues that this charge was unwarranted and misleading to the jury because his defense was not that he believed that *ultimately* everything would

work out so that no one would lose any money, but rather that Fidelity would never suffer any loss because it was purchasing invoices representing legitimate transactions involving the "constructive" delivery of merchandise. Goldstein argues that in light of *United States v. Rossomando,* 144 F.3d 197 (2d Cir.1998), the misleading nature of the charge requires a new trial.

*Rossomando* involved a retired New York City firefighter who claimed disability pension payments under a plan that allowed retired firefighters to earn a limited amount of outside income while receiving a disability pension. In forms submitted to the pension authorities, Rossomando understated the amount of income he received over a period of several years, thereby causing a substantial financial loss to the pension fund. *Id.* at 198. His defense was that he mistakenly believed that his outside earnings did not even approach, much less exceed, the plan's limit on such earnings. Therefore, he claimed, he could not have possessed the requisite intent to defraud because he did not realize that his failure to report all his income could have the effect of depriving the pension fund of money. *Id.*

The Second Circuit held that, under such circumstances, given Rossomando's defense, a "no ultimate harm" charge "posed a genuine risk of confusing the jury into believing that it would be proper to convict Rossomando of mail fraud without finding that he contemplated harm to the Pension Fund . . . ." *Id.* at 200. However, in reaching this conclusion, the Second Circuit cautioned that a "no ultimate harm" charge *is* appropriate in "a case in which the concrete harm contemplated by the defendant is to deny the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions" and cited *United States v. Dinome,* 86 F.3d 277 (2d Cir.1996) as an example of such a case. 144 F.3d at 201 n. 5. In *Dinome,* as opposed to *Rossomando,* the "no ultimate harm" instruction was upheld on the grounds that the defendant's act of intentionally supplying false information on a mortgage application was a proper basis for a mail fraud conviction because it deprived the bank of the right to

control its assets and "diminished the ultimate value of the [mortgage] transaction to the bank as defined by its standard lending practices." 86 F.3d at 280, 284. (internal quotation marks and citation omitted, alteration in original). The *Rossomando* court also cited *United States v. Rodolitz,* 786 F.2d 77 (2d Cir.1986) which involved an elaborate scheme to conceal the fraudulent nature of insurance claims. In order to convict the defendants for this scheme, the Second Circuit held that "the government needed to prove only that [the defendant] employed a deceptive scheme intended to prevent the insurer from determining for itself a fair value of recovery." 786 F.2d at 80–81. Thus, in *Rossomando,* the Second Circuit explained that "providing false information (as in *Dinome* ), or preventing an insurer from deciding the true value of a claim (as in *Rodolitz* ) inherently lessened the value of the relevant transactions to the bank and the insurance company" because "the value of credit or insurance transactions inherently depend on the ability of banks and insurance companies to make refined, discretionary judgments on the basis of full information .... " 144 F.3d at 201 n. 5. Accordingly, the *Rossomando* court held that

> where a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will "ultimately" accrue to the bank, the defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank—i.e., to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant.

144 F.3d at 201. By contrast, the court noted that the income information withheld by Rossomando had no "independent value" to the Pension Fund because the formula by which the limitation on outside income was calculated was "entirely mechanical" and Rossomando's withholding of information therefore did not trigger the exercise of any "discretionary control" over the pension funds. *Id.*

In this case, the Government offered substantial evidence that Josef Goldstein was part of a conspiracy to defraud Fidelity by concealing from it information about the true nature of the underlying transactions between Micro and the "account debtors." In contrast to *Rossomando,* the information concealed from Fidelity was neither "entirely mechanical" nor unimportant to its decisions as to how to allocate its assets. Indeed, the measures taken by Fidelity to verify the invoices, including (a) verifying that the account debtors had received the invoices, (b) verifying that there was no problem with the merchandise, and (c) verifying that the invoices would be paid, indicate the value Fidelity placed on that information in making its funding decisions. Accordingly, this case fits squarely within the rule of *Dinome,* not *Rossomando.*

Moreover, Goldstein cannot avoid this result by attempting to claim that, similar to Rossomando, he mistakenly believed that the information concealed from Fidelity was irrelevant to its funding decisions and that he had no reason to believe that Fidelity was concerned with the difference between actual and constructive delivery of merchandise. This claim is clearly an after-the-fact attempt to recast his defense as an unintentional mistake defense in order to hide behind the protective cover of *Rossomando.* However, in contrast to Rossomando, Goldstein offered no evidence as to his alleged good faith belief that the fraudulent information submitted to Fidelity was irrelevant to Fidelity's funding decisions and never argued that he was operating under a mistaken belief as to the nature of the information sought by Fidelity.[6]

Furthermore, in this case, the Court specifically incorporated into its charge a summary of each defendant's theory of the case based on submissions from the defendants themselves. Thus, even though Josef Goldstein offered no testimony or documentary evidence to establish his understanding of

---

6. Josef Goldstein's defense consisted essentially of a stipulation with regard to provisions of the Uniform Commercial Code and a reading of such provisions to the jury together with his cross-examination of the Government's witnesses.

the nature of the underlying transactions, the charge included the following instruction:

> Defendant Goldstein contends that there is no evidence that he was involved in the day-to-day operations of Micro or that he had any involvement with the shipping documents or invoices that are in evidence. He contends that his activity was confined to the negotiation and execution of the contract between Maxxum and Tandy and that he never had any contact with any representative from Fidelity. He refers to the terms of Micro's agreement with Fidelity. Mr. Goldstein contends that by incorporating portions of the Uniform Commercial Code, that agreement obligated Fidelity to purchase 'accounts' from Micro that resulted from the bona fide sale of merchandise, whether or not the merchandise had actually been shipped to the buyer. Accordingly, he contends that the evidence against him does not prove beyond a reasonable doubt that he was involved in any scheme to defraud.

(Tr. 4358–59.) Thus, in contrast to *Rossomando*, there was no risk that the jury would be confused as to the nature of Josef Goldstein's defense or its legal validity.

**(c) Materiality**

 Finally, Josef Goldstein, joined by his co-defendants, contends that the Court erred in refusing to give the following requested charge, which he argues, is appropriate under *Dinome* when the jury is charged on a "right to control" theory of fraud:

> In addition, you may not find a defendant in this case guilty of wire fraud unless you first find that he intended to defraud Fidelity with a misrepresentation or omission *that the defendant believed was material. In other words, if you find that a defendant, in good faith, believed that the false information in question was irrelevant and not material, you must acquit him of wire fraud.*

(Goldstein Mot. at 22.)

Goldstein's argument is unpersuasive. First, nothing in *Dinome* suggests that such a charge should be given in a "right to control" case. The portion of *Dinome* cited by Goldstein is actually a quotation from a colloquy between the district court and defense counsel in which the district court summarized defense counsel's (rejected) argument.

Second, in this case, the jury was given the following instruction:

> Closely tied up with your consideration of the defendant's knowledge and intent is the question of good faith. However misleading or deceptive a plan may be, it is not fraudulent if carried out in good faith. An honest belief in the truth of the representations made by a defendant, or *an honest belief that all material information has been properly disclosed, is a complete defense.*

(Tr. 4357–58) (emphasis added.) This charge made clear to the members of the jury that they could acquit if they found that Josef Goldstein had a good faith belief that no material information had been withheld from Fidelity. Accordingly, the additional charge proposed by Goldstein was unnecessary.

## CONCLUSION

For the reasons stated, the defendants' motions are denied.

SO ORDERED.